IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-05-00123-CV

 

In the
Interest of

A.M.W.
and A.H.W., Minor Children

 

From the 19th District Court

McLennan County, Texas

Trial Court No. 2003-2553-1

 



MEMORANDUM  Opinion



 

After a bench trial, Appellant Barbara Bernard
appeals the trial court’s termination of her parental rights to her two
daughters, A.M.W. and A.H.W., complaining in four issues of the legal and
factual sufficiency of the evidence.  Because the evidence is factually
insufficient to support the findings that termination would be in the best
interest of the children, we will reverse the termination order and remand this
cause for further proceedings.

          The natural right that exists between
parents and their children is one of constitutional dimension.  In re
J.W.T., 872 S.W.2d 189, 194-95 (Tex. 1994).  A parent's right to “the
companionship, care, custody and management” of his or her children is a
constitutional interest “far more precious than any property right.”  Santosky
v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599
(1982) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208,
1212, 31 L.Ed.2d 551 (1972)).  Therefore, in a case terminating parental
rights, the proceedings are strictly scrutinized and the involuntary termination
statutes are strictly construed in favor of the parent.  Holick v. Smith,
685 S.W.2d 18, 20 (Tex. 1985); cf. Ray v. Burns, 832 S.W.2d 431,
434 (Tex. App.—Waco 1992, no writ) (in reviewing sufficiency of the evidence,
“close calls” go to the parent) (citing Lewelling v. Lewelling, 796
S.W.2d 164, 168 (Tex. 1990)).  Termination is a drastic remedy and is of such
weight and gravity that due process requires the petitioner to justify
termination by “clear and convincing evidence.”  Spangler v. Texas Dept. of Prot. & Reg. Servs., 962 S.W.2d 253, 256 (Tex. App.—Waco 1998, no
pet.).  This standard is defined as “that measure or degree of proof which will
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.”  Id.

          In a proceeding to terminate the
parent-child relationship brought under section 161.001 of the Texas Family
Code, the movant must establish by clear and convincing evidence two elements: 
(1) one or more acts or omissions enumerated under subsection (1) of section
161.001; and (2) that termination is in the best interest of the child. 
Tex. Fam. Code Ann. § 161.001
(Vernon Supp. 2005); Swate v.
Swate, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  The
factfinder must find that both elements are established by clear and
convincing evidence, and proof of one element does not relieve the petitioner
of the burden of proving the other.  Holley v. Adams, 544 S.W.2d 367,
370 (Tex. 1976); Swate, 72 S.W.3d at 766.

Procedural Background

The Department of Family
and Protective Services (“CPS” or the “Department”) petitioned the trial court
to terminate the parent-child relationships of Barbara and Charles White with
A.M.W. and A.H.W.  Charles did not personally appear at trial, and although his
parental rights were also terminated, he has not appealed.

Along with findings that
termination would be in the children’s best interest, the trial court’s
termination order found three statutory violations:  (1) that Barbara knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endangers the
physical or emotional well-being of the children (Tex. Fam. Code Ann. § 161.001(1)(D); (2) that she engaged in conduct or knowingly placed the children with persons
who engaged in conduct which endangers the physical or emotional well-being of
the children (Tex. Fam. Code Ann.
§ 161.001(1)(E)); and (3) that she
failed to comply with the provisions of a court order that specifically
established the actions necessary for her to obtain the return of the children
who have been in the permanent or temporary managing conservatorship of the
Department for not less than nine months as a result of the children’s removal
from the parent under Chapter 262 for the abuse or neglect of the children (Tex.
Fam. Code Ann. § 161.001(1)(O)).[1]

Factual Background

          Barbara, born in 1963, grew up in Connecticut in an upper-middle class family.  Her father was a police officer until Barbara
was 14, when he was injured in the line of duty.  Thereafter, her parents owned
and operated a large kennel where Barbara occasionally worked.  After obtaining
an associate’s degree from a junior college in canine care, she married
Douglas, whom she said emotionally and physically abused her during their
nine-year marriage.  Barbara “experimented” with marijuana in high school and
cocaine in college.  A few years into her marriage with Douglas (also a drug
user), her drug use became a problem.  At the time of her divorce, Barbara entered
a drug treatment facility for nine days of treatment (all that her health
insurance allowed), and her drug usage slowed.

          While still in Connecticut, she met
Charles at work; he too was a drug user.  They had a child, U.W., and during
her pregnancy, Barbara used cocaine, including the day before U.W. was born. 
During her pregnancy, Barbara was honest with her physicians about her drug use,
and Connecticut CPS became involved and took U.W. after her birth, placing her
in foster care and providing services to Barbara.  After about three months,
Barbara relinquished her rights to U.W. and allowed her to be adopted,
explaining at trial that she was not emotionally and financially able to care
for U.W. at that time.

          Barbara and Charles moved to Texas in 1997, settling in New Braunfels where he had family.  Barbara was always employed;
Charles did not work.  They had two daughters; in 1998, A.M.W. was born, and in
1999, A.H.W. was born.  During her pregnancy with A.M.W., Barbara did not use
drugs.  She used drugs early in her pregnancy with A.H.W., but only before she
knew she was pregnant, and she stopped using when she found out she was
pregnant, except for one or two times later in the sixth or seventh month.

          While Barbara was at work, Charles
cared for the children.  She described Charles as a “great father;” because he
was not employed, he took care of the children and played with them; he never
hit or abused the children.  But Charles emotionally and then later physically
abused Barbara, including once hitting her in the face while she was holding
one of the babies.  Barbara received some counseling at shelters, but she
always resumed her relationship with Charles.  She and Charles never used drugs
in front of the children.

          When Barbara and Charles were arrested
for drug possession and possession with intent to deliver in approximately 2001,
they designated Charles’s cousin Anita to keep A.M.W. and A.H.W.  Barbara said
that while she was in jail for seven days, Anita abused A.H.W., forcing her to
eat off the floor because she was “chubby” and punishing her by locking her in
a dark room.  Barbara said that Anita had her own children, that Anita and the
rest of Charles’s family had always been good to A.M.W. and A.H.W., and that
she had no prior knowledge that Anita might be abusive.  Barbara claimed to
have reported this abuse and the possible sexual abuse of A.M.W. to CPS, but
she said they found no sexual abuse.  Barbara never let the children around
Anita after that, and she sought medical care for them after the abuse.  During
this time frame, Barbara had become very estranged from her parents in Connecticut.

          After being sentenced to nine years’
probation (Charles got a five-year prison sentence) on the drug charges,
Barbara moved to Waco with her children and entered the drug treatment program
at the Freeman Center, which allowed children.  They stayed there from May 2002
to September 2002.  While at the Freeman Center, A.H.W., who has a seizure
disorder, suffered leg weakness after a seizure, and when Barbara was bathing
the children and left the room to get a towel, A.H.W. fell in the tub and
suffered a gash over her eye that required seven stitches.  The very next night
after bathing, A.H.W. was jumping and slipped and hit a trash can, breaking
some of the stitches.  Another Freeman Center resident expressed concern that
Barbara was injuring A.H.W., so to disprove her, Barbara called CPS on
herself.  CPS’s investigation cleared Barbara of abuse but found neglectful
supervision.  Barbara then began parenting classes, evaluations and monitoring,
and counseling through CPS.  While they were at the Freeman Center, CPS never objected to the children being around the other residents, who were
recovering from similar drug problems.

          Barbara and the children next moved to
Compassion Ministries, a Waco transitional-housing facility for single women
and families, where they stayed from September 2002 to April 2003 while Barbara
worked toward achieving independent living.  She got a bicycle and a job, and
she obtained therapy for the children at the Advocacy Center.  While they were
at Compassion Ministries, CPS did not object to the children being around the
other residents, who like Barbara were recovering from drug problems.  After
completing that program, she got an apartment and an unreliable car.  She had
been working for some time at Taco Cabana, where a co-worker, Alton (whom she
later learned was a convicted felon), helped her out with transportation.  She
began a relationship with Alton, and when that relationship became abusive, she
reported it to CPS, which restricted Alton from unsupervised contact with the
children, and later restricted Barbara from any contact with Alton.  At one
point, because the children and Alton had become attached, she asked CPS if Alton could see the children.

          After thirteen months of sobriety, Barbara
began using drugs (crack cocaine) again, which she admitted to CPS and
attributed to financial stress due to her having lost free or low-cost day care
and other social services and to stress from Alton’s physical abuse and
stalking.  Also, after Barbara reported an assault by Alton to the police, Alton called CPS to report Barbara’s drug use.  Barbara began working extra hours, so she
hired Erica, a CPS-approved babysitter, to watch the children.  Erica, however,
without Barbara’s knowledge, began letting Alton in the apartment and around
the children while Barbara was at work.

          Upon learning of Barbara’s drug use, CPS
removed the children in July 2003 and put them in foster care.  A CPS
caseworker described their condition at that time as clean and healthy.  Barbara
saw them twice a month and continued to work.  She next tried the Freeman Center’s outpatient program, but she soon realized she needed inpatient care so
that she could get out of her poor environment.  She said that to qualify for
inpatient care, she needed a positive drug test, but because a test would show
she was clean, she signed an affidavit that if she were tested, she would not
pass.  Because Barbara thought that she would finish the inpatient program in
six months, she told the CPS supervisor (Katy Capp Hays) that she wanted the
children placed at the Methodist Home, but CPS wanted the children in foster
care under protective custody so that Barbara could not get possession of them
at any time.  Barbara left information about the girls’ health and behavioral
problems with CPS, but she claimed that CPS discarded the information, which
led to the girls having problems with the foster parents.

          In approximately March 2004, Barbara
went to the Comal County jail for 102 days after her probation was revoked, and
then she was sent to the Central Texas Treatment Center in Granger.  While
there, the children visited her twice.  While incarcerated and in rehab,
Barbara consistently wrote the children; she also wrote many letters to CPS
caseworker Jamie Grohoske, stating her intent to get her children back and
inquiring about the children’s well-being.  Barbara successfully completed the
initial program in six months and moved into a “three-quarter” house (Oxford
House) with no counselors.  That house is run by the residents under a strict
code with democratic votes on all matters; drug use results in immediate
expulsion.  At the time of trial (January 2005), the girls had visited her
twice at Oxford House, and Barbara had obtained the necessary vote for the
girls to live there.  She had been working as a pet groomer for only six weeks
and was already making $300 a week in commissions.  Barbara had reconciled with
her parents as a result of her treatment, and she had a plan to return to Connecticut with the girls after completing her program and to work with her brother at their
parents’ kennel.  Barbara had a Narcotics Anonymous (NA) “sponsor” to rely on
to avoid a drug relapse, and she had been clean and sober for a year at the
time of trial.  She was attending NA meetings daily and sometimes twice a day. 
She had five more years of parole, and she knew she would go to prison if it
were revoked.

Best Interest of the
Children

          In her fourth issue, Barbara asserts
that the evidence is legally and factually insufficient to support the trial
court’s finding that termination is in the children’s best interest.  Because
the burden of proof in termination cases is clear and convincing evidence, both
legal and factual sufficiency reviews must take into consideration whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction about the truth of the matter on which the petitioner bears the
burden of proof.  In re J.F.C., 96 S.W.3d 256, 264-68 (Tex. 2002)
(discussing legal sufficiency review); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002) (discussing factual sufficiency review).

In a legal sufficiency review, a court should
look at all the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true.  To give appropriate deference to the
factfinder’s conclusions and the role of a court conducting a legal sufficiency
review, looking at the evidence in the light most favorable to the judgment
means that a reviewing court must assume that the factfinder resolved disputed
facts in favor of its finding if a reasonable factfinder could do so.  A
corollary to this requirement is that a court should disregard all evidence
that a reasonable factfinder could have disbelieved or found to have been
incredible.  This does not mean that a court must disregard all evidence that
does not support the finding.  Disregarding undisputed facts that do not
support the finding could skew the analysis of whether there is clear and
convincing evidence.

 

          If, after conducting its legal
sufficiency review of the record evidence, a court determines that no
reasonable factfinder could form a firm belief or conviction that the matter
that must be proven is true, then that court must conclude that the evidence is
legally insufficient.

  

J.F.C.,
96 S.W.3d at 266.

In a factual sufficiency
review, a court of appeals must give due consideration to evidence that the
factfinder could reasonably have found to be clear and convincing.  Id.

[T]he inquiry must be “whether the evidence is
such that a factfinder could reasonably form a firm belief or conviction about
the truth of the State’s allegations.”  A court of appeals should consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved that disputed evidence in favor of its finding.  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction, then the evidence is
factually insufficient.  A court of appeals should detail in its opinion why it
has concluded that a reasonable factfinder could not have credited disputed
evidence in favor of the finding.

 

Id.
at 266-67 (footnotes and citations omitted); see C.H., 89 S.W.3d
at 25.  We view the evidence in a neutral light when reviewing for factual
sufficiency.

          In addition to establishing a
predicate statutory violation,[2] a
movant must establish by clear and convincing evidence that termination is in
the best interest of the child.  Tex.
Fam. Code Ann. § 161.001.  Factually
insufficient evidence on a finding that termination was in the child’s best
interest is enough to justify reversal.  In re S.A.P., 169 S.W.3d 685, 706-11
(Tex. App.—Waco 2005, no pet.) (reversing termination of mother’s rights
because of factually insufficient evidence on best interest, despite establishment
of statutory violation); Yonko v. Dep’t Fam. & Prot. Servs., ---
S.W.3d ---, ---, 2005 WL 3500775, at *4 (Tex. App.—Houston [1st Dist.] Dec. 22,
2005, no pet. h.) (reversing termination because evidence factually
insufficient on best interest); Horvatich v. Tex. Dep’t Prot. & Reg.
Servs., 78 S.W.3d 594, 604 n.6 (Tex. App.—Austin 2002, no pet.) (reversing
termination because evidence factually insufficient on best interest).

          Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of a child include:

(1)
the desires of the child;

(2)
the emotional and physical needs of the child now and in the future;

(3)
the emotional and physical danger to the child now and in the future;

(4)
the parental abilities of the individuals seeking custody;

(5)
the programs available to assist these individuals to promote the best interest
of the child;

(6)
the plans for the child by these individuals or by the agency seeking custody;

(7)
the stability of the home or proposed placement;

(8)
the acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

(9)
any excuse for the acts or omissions of the parent.

 

Holley,
544 S.W.2d at 371-72.  These factors are not exhaustive, and some of the listed
factors may be inapplicable to some cases, while other factors not listed may
also be considered when appropriate.[3]  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each Holley factor will not support such a
finding.  Id.

         The Holley factors focus on the
best interest of the child, not the best interest of the parent.  Dupree v. Tex. Dept. Prot. & Reg. Servs., 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ) (citing
D.O. v. Tex. Dep’t of Human Servs., 851 S.W.2d 351, 358 (Tex.
App.—Austin 1993, no writ)).  But there is a strong presumption that the best
interest of the child will be served by preserving the parent-child
relationship.  Swate, 72 S.W.3d at 767.  “The presumptive right of parents is grounded in good policy
considerations.”  Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976).  It is the public policy of Texas to “assure that children will have frequent
and continuing contact with parents who have shown the ability to act in the
best interest of the child.”  Tex. Fam.
Code Ann. § 153.001(a)(1) (Vernon 2002).  On the other hand, the goal of establishing a stable permanent home
for a child is a compelling state interest.  Dupree, 907 S.W.2d at 87.

          Barbara’s mother Lillian testified,
stating that Barbara had made a “total turn around” and that after Barbara finished
her treatment program at the Oxford House, Barbara and the children could stay
in their Connecticut home and Lillian and Barbara’s father would financially
support Barbara and the children, including paying for a nanny, if necessary. 
Barbara’s brother, who now runs the family kennel, has offered Barbara a job
there.  Lillian said that if Barbara were to relapse in her drug addiction, she
and her husband would take care of the children financially.

          Barbara explained to the trial court
why it would not be in the children’s best interest for her rights to be
terminated:

Because I have changed my life.  I have – I have
never worked a program before.  Although I have been in treatment, I have never
worked a program before and this time I have.  I have a sponsor who I meet with
weekly.  I am – this was a totally different kind of treatment.  It was very
intense, very get rid of all the crap that make people use drugs.  I mean, a
lot of stuff is emotional and from your background and what happened when you were
a child.  And this place made me go through all of that and deal with all of
that. . . .  I’m just not feeling that I’m the same person anymore.  I have
changed a lot.  I love my kids and I want to be with them.

 

She later testified:

 

I have always taken care of these girls.  I have
been there for them.  I have had the means to take care of them to the best of
my ability to take care of them and raise them.  They are everything to me. 
They are all I want in life is to take care of my girls and raise my girls.  I
don’t want them to never know who I am or just to have memories of me.  My
girls are everything to me.

 

And I know that I have done wrong.  I know that
I have screwed up in the past.  But I also know that I am capable of doing
this; that I have gone through such a change that it’s amazing the things I can
do in my life now.  And I know I can do them.  And I don’t – I don’t get upset
if somebody says, “There’s no way you can do that,” because I prove them wrong,
that I can.

 

I’m very good at what I do in my grooming.  And
I’m very good at taking a dead job that had nothing – that had no – and raised
it.  And I’m now making $300 a week.  And I did this in a month and a half or
less time.  I know I can provide for my children.  I know I can take care of
them.  And I know I can give them a good place and a good and safe home to live
in. . . .  I want my kids.

 

          Barbara admitted that her past drug
use had not been in the children’s interest, but she said she always made sure
that they were taken care of, housed, clean, clothed, and had what they
needed.  Barbara did not have an opinion on whether termination of Charles’s
parental rights would be in the children’s best interest, but she did not want
any type of relationship with him.  She did not want Charles to have possession
of the children, and if the court ordered that Charles have no contact with the
children, Barbara would comply.

Christina Corwin, a
counselor assigned to Barbara by CPS, provided her with therapy from September
2003 until January 2004, dealing with drug issues, coping skills, and
depression.  Her main concern during therapy was Barbara’s relapses, and she
recommended residential treatment, which Barbara sought and completed.  Corwin
noted that Barbara really cared for her children, strove to be a good parent,
asked for help and advice, and took responsibility for her mistakes.  Corwin
had no criticism of Barbara during the time that she treated her; she thought
Barbara was a good person.  Corwin felt that, with additional time (six months)
and supervision, Barbara could meet the requirements to have the children
returned, noting that the children had never been injured and that Barbara’s
issues were drugs and bad choices in men.  She recommended reunification under
the right circumstances.  Because she had not seen Barbara in over a year,
Corwin would not opine on termination.

Wesley Walker, the
children’s counselor through CPS, provided them therapy for thirty-three
weeks.  He attributed their behavioral difficulties to their removal and their
foster care experiences.  He said that much of A.H.W.’s acting out was the
result of being separated from Barbara.  Walker described the children as very
bonded to Barbara; she was the central focus of their attention and play, they
always talked positively about her, and they felt they would be reunited.  The
girls were always very positive after their visits with Barbara, and they never
talked negatively or acted out.  They did not react well to talk of
termination; rather, they showed significant anxiety.  Walker thought that it
could be extremely detrimental for the children if Barbara were removed from
their lives; he also said it would be just as detrimental if Barbara’s rights
were not terminated and she went back to using drugs.  He knew of no clear and
convincing evidence that Barbara’s rights should be terminated, and he thought
that, if Barbara got the children back, stayed clean for six more months, and
got the children more counseling, it would have a good effect on the children.

Mark Van Dusen was
Barbara’s counselor at the Central Texas Treatment Center, a long-term
treatment center, and treated her from June 2004 to December 2004.  Barbara’s
treatment method was based on “cognitive restructuring,” where the patient
learns to change the way she thinks in order not to have the behaviors that get
her in trouble.  He said that after a slow start, Barbara grasped
recovery—particularly the 12-step program—and made a dramatic change.  She
became very attentive and was “dead set” on getting her children back.  He
observed her visits with the children, noticing that they were loving, happy,
and responsive with Barbara and were fairly well adjusted.  Van Dusen thought that
Barbara should have a chance to have the children in a structured environment
like Oxford House and that her rights should not be terminated.  If Barbara
returned to using cocaine, Van Dusen thought that the children should not be
with her.

Katherine Davis, a
probation officer and licensed chemical dependency counselor at the Central Texas Treatment Center, treated Barbara there in a program that emphasized
mother/daughter issues, relationships, chaos and conflict avoidance, and
self-esteem.  In this program Barbara was able to rebuild her relationship with
her mother.  After her discharge in December 2004, Barbara was to be in Davis’s women’s skills group for a year.  Davis confirmed the adequacy of Oxford House,
which she said had a high success rate.  She said that Barbara and the children
could stay there as long as Barbara wanted, though Davis recommended against
immediate placement of the children with Barbara because planning for such a
change would be needed.  She envisioned Barbara’s long-term recovery plan to
take three to five years.  Davis told the court, “Professionally, I think that
Barbara has what it takes, with some services, with a plan that she can do
this.”

Debbie Miller, the
director of Waco Child Care, a daycare facility where Barbara had the children
at one point (when Barbara was struggling financially and using), saw nothing
that concerned her about the girls’ condition.  Barbara appeared to Miller to
put the children’s needs first.  Based on her past interaction with and
observations of Barbara and the children, Miller did not believe that Barbara’s
rights should be terminated.  Jill McCall was executive director of Compassion
Ministries and testified that Barbara’s history of hard work and honest
self-disclosure and her loving and close relationship with her daughters
warranted giving Barbara a second chance.  James Lawson, a counselor at the Freeman Center, where he became acquainted with Barbara and the children, said that Barbara
should be given another chance, based on her recovery and progress to date on
her depression and codependent behavior problems.  Ella Pearl Foster, the
foster parent who cared for the children in the year before trial, said that
they were always happy talking about Barbara, had good memories of her, and
loved her.  A.H.W. wanted to stay with Barbara and was angry when she could
not.

Katy Capp Hays, a CPS
supervisor, opined that Barbara’s parental rights should be terminated because
of her long history of drug abuse and relapse, her history of involvement with
abusive men, and the need for the children to have a safe and permanent home. 
Hays did not think that a drug rehab home like Oxford House was appropriate for
the children, but she had never visited it.  Also, Hays and the Department did not
have any of Barbara’s treatment records for the year before trial, and she had
not communicated with Barbara’s providers for the prior year.  Hays believed
that Barbara’s prognosis for avoiding a relapse was poor, but she conceded that
Barbara’s drug counselors were in a better position to judge Barbara’s success
potential.

Jamie Grohoske, who was
the children’s current CPS caseworker, said that termination was appropriate
because of her past reluctance to leave Charles when he sold drugs out of their
home and was violent in the children’s presence, and because Barbara’s
continued need for restrictive supervision was not healthy for the children.  She
felt that Barbara would continue to put the children at risk and was concerned
of a relapse in the future.  Grohoske thought that, after three years in
institutional or foster care, the children need stability.  According to
Grohoske, Barbara had done what was on her service plan, but she had not proved
to Grohoske that she could provide a safe and stable home for the children. 
Grohoske also said that Barbara had not paid court-ordered child support, but
Grohoske admitted not setting up the account for Barbara and that there was a
good chance Barbara did not even know about it.

  Grohoske described
Barbara’s relationship with the children as more like peers than parent-child
and that the children did not see Barbara as an authority figure.  Grohoske
admitted that she had little information on Barbara for the six-month period
before trial, but she nevertheless recommended termination.  She also admitted
that if it were not for the Family Code’s dismissal deadline in this case, she
would be staffing with her supervisor for possible reunification.

         We will evaluate the legal and factual sufficiency
of the evidence primarily in the context of the Holley factors, but also
with consideration of the Family Code’s best interest factors found in section
263.307.  See In re J.I.T.P., 99 S.W.3d 841, 846-48 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (applying Holley factors and section 263.307 factors
in best interest analysis); see also Lana S. Shadwick, Duke Hooten,
& Charles G. Childress, Grounds for Termination of Parental Rights, in
2005-4 State Bar Section Report: Family
Law 9, 10 (Fall 2005) (noting additional factors for determining best
interest in section 263.307 when Department is a party).

 

 

(1)  
     Desires of the
children  

 

          There was no evidence that the
children did not want to reunite with Barbara; in fact, the evidence was
overwhelmingly to the contrary.  CPS acknowledged the strong bonds between
Barbara and the children and their love for her.  See Yonko, --- S.W.3d at ---, 2005 WL 3500775, at *7 (“While [it] is true that the child’s desire to remain with his
parents is only one factor to consider among many, his love for his parents
cannot be ignored as a reflection of the parent’s ability to provide for the
child’s emotional needs.  Where the evidence of the parent’s other failures is
not overwhelming, the desires of the child weigh against termination of
parental rights.”).  The evidence on this factor strongly weighs against a
finding that termination was in the children’s best interest.

          (2)      Emotional and physical
needs of the children now and in the future

          Barbara believed that the children
needed to continue counseling with Walker or another counselor.  Walker, the
children’s counselor, said that termination could be “extremely detrimental” to
the girls, whose behavior he said improved after visits with Barbara.  CPS
agreed that Barbara had met A.H.W.’s medical needs in the past for her seizure
disorder, and Barbara tried to assist CPS and the girls’ foster parents in how
to care for them.  CPS found the girls to be healthy and in good condition when
they were removed.  Despite her drug addiction, the evidence indicated that
Barbara always provided the children with food, clothing, shelter, medical
care, and love while they were in her care.  Barbara admitted that she could go
to prison if her parole was revoked.  Nevertheless, the evidence on this
factor weighs against a finding that termination was in the children’s best
interest.




          (3)      Emotional and physical
danger to the children now and in the future

          There was evidence of one remote violent
act by Charles against Barbara in the children’s presence, and that was when
the children were very young.  But because Charles’s parental rights were also
terminated, he is effectively out of the children’s lives.[4] 
Barbara and her counselors discussed Barbara’s realization in her recovery
program that she did not have to have a man in her life, which indicates that
she was breaking through her cycle of abusive men.  There was no evidence that
the children have been emotionally scarred by any event, and there was no
evidence that Barbara had ever used drugs in the children’s presence in the
past.  There was no evidence that the children were ever physically abused or
that Barbara ever neglected their physical and medical needs.

          CPS caseworkers were primarily
concerned with the risk that Barbara could relapse in the future, despite her
two lengthy periods of sobriety and the progress she had made in the year
before trial.  We acknowledge—as Barbara has—the evidence of her lengthy
scourge of drug addiction.  But we also acknowledge the undisputed evidence
about Barbara’s success in her drug rehabilitation program in the year before
trial and her counselors’ supportive testimony.  See, e.g., Horvatich, 78
S.W.3d at 598-99 (in reversing termination on best interest, court discussed
mother’s rehab success).  Notably, CPS had not even obtained Barbara’s
treatment records for the prior year.

          Certainly there is the theoretical
possibility that Barbara, like any alcoholic or drug addict, could relapse, but
there was no showing by direct evidence of a present or future danger; rather,
it was the speculative opinions of the CPS caseworkers—who had not even
obtained and reviewed Barbara’s recovery records for the prior year—that this “could”
happen in the future and that therefore Barbara’s rights should be terminated. 
However, “acts done in the distant past, without showing a present or future
danger to a child, cannot be sufficient to terminate parental rights.”  Wetzel
v. Wetzel, 715 S.W.2d 387, 391 (Tex. App.—Dallas 1986, no writ) (evidence didn’t support termination of mother's rights based on
finding mother engaged in conduct that endangered physical or emotional
well-being of children because evidence showed mother had been cured of mental
problems that caused her to abuse children).

          We conclude that a reasonable
factfinder could not have credited the disputed evidence in favor of finding
that emotional or physical danger to the children now and in the future would
result from allowing Barbara to retain her parental rights.  The evidence on this factor weighs against a finding that
termination was in the children’s best interest.

          (4)      Parental abilities of the individuals
seeking custody:  

          Grohoske testified that Barbara’s
relationship with the children was more peer-like than parent-child and that
she was not an authority figure to the children, while other witnesses
testified that Barbara and the children were very loving and bonded with each
other and that Barbara appeared to be a good parent.  We conclude that this
factor does not weigh strongly in favor of or against termination of Barbara’s
parental rights.

          (5)      Programs available to
assist these individuals to promote the best interests of the children 

 

          Barbara had complied with or performed
all of the counseling, parenting classes, evaluations, and other tasks required
by the Department.  There was no evidence that she would not avail herself of
additional programs in the future, and on her own she had looked into available
programs and therapy for the children at and near Oxford House, which offers
Alanon and Alatot programs for children.  She had checked into the schools in
the Cedar Park area and after-school programs at the YMCA.   Barbara’s parents
offered financial assistance if needed.

          Other than counseling, the Department
offered no evidence of other programs for the children, including assistance
for treating the girls’ trauma and anxiety upon termination of Barbara’s
parental rights.  The evidence on this factor weighs against a
finding that termination was in the children’s best interest.

          (6)      Plans for the children by
these individuals or by the agency seeking custody  

          Barbara’s short-term plan was for the
children to live with her at Oxford House while she finished her program.  She
has reconciled with her family in Connecticut; her parents would let her and
the children live in their home, and her brother had offered her a job at the
family’s kennel, which is on the same property as the family home.

          The Department’s plan was to place the
children for adoption, but its witnesses admitted that children as old as
A.M.W. and A.H.W. are statistically harder to have adopted.  They also admitted
that because the children are bi-racial (Barbara is white and Charles is
black), that too will make it harder for them to be adopted.  The Department
had no one waiting in the wings to adopt them.  The evidence on this
factor weighs against a finding that termination was in the children’s best
interest.

          (7)      Stability of the home or
proposed placement

          Barbara had obtained permission for
the children to move in with her at Oxford House, which is a residential house
in a residential neighborhood, and they could stay there as long as they
wanted.  The caseworkers were critical of having the children in a residence
with other recovering addicts, but they had not complained when Barbara lived
with the children at the Freeman Center and Compassion Ministries.  If she went
to Connecticut with the children, they would live in Barbara’s childhood home
where Barbara would work with her brother at the family kennel located on the
same property.  Her parents would be living there half of the year (they spend
the winter in Florida), and they would pay for a nanny if necessary.

          At the time of trial, the Department
still had the children in foster care, and it had no prospective adoptive
family.  The evidence on this factor weighs against a finding
that termination was in the children’s best interest.

(8)  
Acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one 

 

          Barbara’s past drug use and addiction
and her history of abusive relationships are detailed above, as is her recovery
from those problems.  We conclude that because of the passage of time, this
factor does not weigh strongly in favor of or against termination.

          (9)      Any excuse for the acts or
omissions of the parent 

          Barbara took full responsibility for
her drug usage and criminal conduct; she did not offer excuses for her past
behavior, though she pointed to financial stress and trouble with Alton as triggers for her relapse after Compassion Ministries.  We conclude that this
factor does not weigh strongly against or in favor of termination.

          Section 263.307 factors

          Of these thirteen factors, evidence on
only two factors weighs in favor of termination:  subsection (7) history of
abusive or assaultive conduct by child’s family or others who have access to child’s
home; and subsection (8) history of substance abuse.  Tex. Fam. Code Ann. § 263.307(b)(7), (8).  But the compelling
evidence of Barbara’s recovery and its mitigating effect on these factors lead
us to conclude that these two factors do not weigh strongly in favor of
termination.  The evidence on the other eleven factors in section 263.307 weigh
termination.  See id. § 263.307(b)(1-6), (9-13).

          Application

          Hays and Grohoske of CPS both
testified that termination would be in the children’s best interest because of
Barbara’s history of drug addiction and abusive relationships.  On the trial
court’s findings that termination of Barbara’s parent-child relationships with
her two children would be in their best interest, and considering this evidence
in relation to the best interest factors in the light most favorable to the
trial court’s findings, we hold that a reasonable trier of fact could have
formed a firm belief or conviction that termination was in the children’s best
interests.  Yonko, ---
S.W.3d at ---, 2005 WL 3500775, at *11 (finding evidence legally (but not
factually) sufficient on best interest); Horvatich, 78
S.W.3d at 601-04 (same); In re K.C.M., 4 S.W.3d 392, 398-99 (Tex.
App.—Houston [1st Dist.] 1999, pet.
denied) (same), overruled in part on other grounds, In re C.H., 89
S.W.3d 17 (Tex. 2002).  We overrule
Barbara’s no-evidence complaint in her fourth issue.  

          But given the presumption that
children should remain with their parents and the high evidentiary standard the
Department must meet, and viewing all the evidence in a neutral light in
relation to the best interest factors, we hold that a reasonable trier of fact could
not have found factually sufficient evidence exists to form a firm belief or
conviction that termination of Barbara’s parent-child relationships with A.M.W.
and A.H.W. was in their best interest.[5]  See,
e.g., Yonko, --- S.W.3d at ---,
2005 WL 3500775, at *5-11 (reversing termination because of factually
insufficient evidence on best interest); S.A.P., 169 S.W.3d at 706-11
(same); In re C.T.E., 95 S.W.3d 462, 467-69 (Tex. App.—Houston [1st
Dist.] 2002, pet. denied) (same);
Horvatich, 78 S.W.3d at 600-04
(same); In re D.T., 34 S.W.3d 625, 641-42 (Tex. App.—Fort Worth 2000,
pet. denied); K.C.M., 4 S.W.3d at 398-99 (same).  The
evidence is factually insufficient on the best interest findings against Barbara. 
We sustain Barbara’s factual sufficiency complaint in her fourth issue.

            Conclusion

We reverse the trial court’s termination order
and remand this cause to the trial court for a new trial.  We set a new
dismissal date at 180 days after the issuance of our mandate in this cause.  See
In re J.B., 93 S.W.3d 609, 626 (Tex. App.—Waco 2002, pet. denied).  The
trial court may not extend this deadline.  “If the [trial] court ... does not
render a final order or dismiss the suit on or before the required date for
dismissal . . . , the court shall dismiss the suit.”  Tex. Fam. Code Ann. § 263.401(c) (Vernon Supp. 2005).

 

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

          (Chief
Justice Gray dissenting)

Reversed
and remanded

Opinion
delivered and filed February 22, 2006

[CV06]









    [1]       The
trial court terminated Charles’s parental rights with two findings of statutory
violations under subsections 161.001(1)(D)
and (E).





   
[2]       On
Barbara’s second issue, we find that the evidence is legally sufficient to
support the trial court’s finding that she engaged in conduct or knowingly
placed the children with persons who engaged in conduct that endangered the
physical or emotional well-being of the children.  See Tex. Fam. Code Ann. § 161.001(1)(E). 
The following is evidence on which a reasonable trier of fact could have formed
a firm belief or conviction that Barbara engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangered the physical
or emotional well-being of the children:  Barbara’s cocaine use during her
pregnancy with A.H.W., she remained with Charles despite his pattern of abuse,
and she used cocaine before and after CPS became involved.  Because of this
legal sufficiency holding, the most relief that Barbara can obtain is a remand
for a new trial.  We thus need not address her other two legal sufficiency
complaints.

 





    [3]       In
the context of permanency hearings, the Family Code identifies the following
factors to consider in a best interest determination:

 

(a) In considering the factors established by
this section, the prompt and permanent placement of the child in a safe
environment is presumed to be in the child’s best interest.

(b) The following factors should be considered
by the court, the department, and other authorized agencies in determining
whether the child’s parents are willing and able to provide the child with a
safe environment:

            (1) the child’s age and physical and
mental vulnerabilities;

            (2) the frequency and nature of
out-of-home placements;

            (3) the magnitude, frequency, and
circumstances of the harm to the child;

            (4) whether the child has been the
victim of repeated harm after the initial report and

intervention by the department or other agency;

            (5) whether the child is fearful of
living in or returning to the child’s home;

            (6) the results of psychiatric,
psychological, or developmental evaluations of the child,

the child’s parents, other family members, or
others who have access to the child’s

home;

            (7) whether there is a history of
abusive or assaultive conduct by the child’s family or

others who have access to the child’s home;

            (8) whether there is a history of
substance abuse by the child’s family or others who

have access to the child’s home;

            (9) whether the perpetrator of the
harm to the child is identified;

            (10) the willingness and ability of
the child’s family to seek out, accept, and complete

counseling services and to cooperate with and
facilitate an appropriate agency’s close

supervision;

            (11) the willingness and ability of
the child’s family to effect positive environmental

and personal changes within a reasonable period
of time;

            (12) whether the child’s family
demonstrates adequate parenting skills, including

providing the child and other children under the
family’s care with:

                        (A) minimally adequate
health and nutritional care;

                        (B) care, nurturance,
and appropriate discipline consistent with the child’s

physical and psychological
development;

                        (C) guidance and
supervision consistent with the child’s safety;

                        (D) a safe physical home
environment;

                        (E) protection from
repeated exposure to violence even though the violence

may not be directed at the child;
and

                        (F) an understanding of
the child’s needs and capabilities; and

            (13) whether an adequate social
support system consisting of an extended family and

friends is available to the child.

 

Tex. Fam. Code Ann. § 263.307(a, b) (Vernon 2002).

            





    [4]       We
note ironically that, despite Barbara’s written request to the contrary, CPS
sent legal papers to Charles that revealed Barbara’s physical address.  Barbara
subsequently received a note from Charles that stated that he knew where she
was but would leave her alone.





    [5]       We
question whether the evidence would even meet the lesser standard of
preponderance of the evidence, much less the clear and convincing standard, in
favor of a finding that termination was in the children’s best interest.  See
Horvatich, 78 S.W.3d at 601 (stating evidence didn’t even meet
preponderance standard on best interest and reversing for factual insufficiency
under clear and convincing standard).